IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

ROBERT EARL JOHNSON PLAINTIFF

v. Civil No. 6:08-cv-06063

DAVID TURNER, Sheriff, Clark County, Arkansas; and JACKIE NEWBURN, Jail Administrator, Clark County Detention Center DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Robert Earl Johnson (hereinafter Johnson), currently an inmate of the Arkansas Department of Correction, North Central Unit, in Calico Rock, Arkansas, filed this civil rights action pursuant to 42 U.S.C. § 1983. Johnson contends his constitutional rights were violated while he was incarcerated at the Clark County Detention Center from May 8, 2008, to July 9, 2008. Specifically, he contends his rights were violated when he was denied adequate medical care.

Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2007), the Honorable Robert T. Dawson, United States District Judge, referred this case to the undersigned for the purpose of making a report and recommendation. Defendants filed a Motion for Summary Judgment (Doc. 17). To assist Johnson in responding to the Motion for Summary Judgment, a questionnaire was propounded (Doc. 20) by the Court. Johnson filed a timely response to the questionnaire (Doc. 21). The motion is now before me for issuance of this report and recommendation.

**I. Background**

On May 8, 2008, Johnson was booked into the Clark County Detention Center (CCDC) after being arrested on several felony charges. *Response* (hereinafter *Resp.*)(Doc. 21) at ¶ 1. He remained

incarcerated at the CCDC until July 9, 2008, when he was transported to the Arkansas Department of Correction (ADC). *Id.* at ¶ 2.

When he was booked in, Johnson maintains he told the book-in officer that he had kidney trouble. *Resp.* at ¶ 3(A). He also stated he was on a number of medications including Terazosin, Ranitidine, Ultram, and Cipro. *Id.* at ¶ 3(C).

Beginning on May 15th, Johnson contends the inmates started being locked down twenty-three hours a day. *Resp.* at ¶ 4. When he was unable to move around, Johnson asserts his urinary track closed and he was unable to urinate. *Id.* at ¶ 3(B) & ¶ 4. On May 17th, he was hurting so much that a cell-mate, Harold McCune, beat on the door to get the jailer's attention. *Id.* at ¶ 5. Johnson maintains that the jailer, Officer Plyer, did not come to check on him until 1:00 p.m. on May 18th. *Id.* at ¶ 6. Approximately thirty minutes later, Johnson states he was taken to the emergency room at Baptist Health Center in Arkadelphia. *Id.* Johnson indicates the delay in transportation was a result of the fact that an officer had to be called off the road to transport inmates anywhere. *Id.* at ¶ 11.

At the emergency room, a Foley catheter was inserted and Johnson was instructed to follow-up with his physician, Dr. Wright, on Wednesday, May 21st. *Resp.* at ¶ 8. According to Johnson, the doctor informed him that if treatment had been delayed any longer his bladder would have burst. *Id.* at ¶ 7. Although Defendants submitted hospital records from Johnson's later visits to the emergency room, no records have been submitted from the May 18th visit.

Johnson was seen by Dr. Wright on May 21st and diagnosed with urethral stricture (an abnormal narrowing of the tube that carries urine out of the body from the bladder) and urinary

retention. *Id.* at ¶ 9. Dr. Wright decided to leave the catheter in until May 26th and prescribed Cipro, an antibiotic, twice a day for ten days. *Id.* at ¶ 10.

Johnson was taken back to the emergency room on May 26th for removal of the catheter. *Resp.* at ¶ 11. Johnson refused to have it removed because he felt his life was in danger. *Id.* at ¶ 12. He again asserts he just made it to the emergency room the first time. *Id.* at ¶ 11.

On May 28th, Jackie Newburn spoke with Dr. Wright over the telephone and advised him that Johnson was refusing to allow the catheter to be removed. *Resp.* at ¶ 13. Dr. Wright advised Newburn that there was no reason Johnson could not urinate on his own. *Id.* at ¶ 14. However, he said to go ahead and leave the catheter in and continue the antibiotics. *Id.*

On June 3rd, Johnson submitted a request asking the CCDC assist him in being sent to the ADC Diagnostic Unit as soon as possible because he was in pain and worried about the risk of infection from the catheter. *Resp.* at ¶ 15. Johnson indicates he made this request because personnel at the CCDC were not concerned about him or his welfare. *Id.* He indicates there were times he didn't get his medication. *Id.* at ¶ 10. He also maintains that "things are missing from this." *Id.* at ¶ 15. *See also* ¶ 21 ("Like I said some papers are not here."); ¶ 30 ("All my papers are not here."). It is unclear from his summary judgment response whether Johnson is referring to documents in his jail file or to the summary judgment motion filed by the Defendants.

In response to his concern about infection, Newburn replied that she telephoned Dr. Wright's office and was told by the nurse that there was no need for him to continue to take antibiotics with the catheter in use. *Defendants' Exhibit* (hereinafter *Defts' Ex.*) E.

On June 10th, Johnson was seen by Dr. Gary Gehrki. *Resp.* at ¶ 17. Dr. Gehrki examined Johnson and noted that he wanted to leave the catheter in. *Id.* Johnson was prescribed Ultram for

pain as needed and Cipro, twice a day, for ten days. *Id.*; *Defts' Ex.* F. Johnson indicates he had been requesting some more bags for his catheter because the one he had was "stinking" despite his washing it numerous times. *Id.*

On June 17th, Johnson again asked for some bags for the catheter. *Resp.* at ¶ 18. In response, Newburn stated she had spoken with the nurse and was advised the bag was fine as long as it wasn't leaking. *Id.* at ¶ 19. There is no indication in the record of whether or not the nurse was informed the bag was giving off an odor. Newborn indicated she was told the bag could be changed monthly. *Id.* Although he doesn't disagree that the nurse made these statements, Johnson maintains the bag was "stinking" and "nasty." *Id.* at ¶¶ 18 & 19.

On June 20th, Johnson submitted a medical request stating that he could not urinate, was in pain, and needed to go to the emergency room. *Resp.* at ¶ 20. He was taken to the emergency room at 11:10 a.m. that day. *Id.* at ¶ 22. He was prescribed Flomax and told to follow-up with his primary doctor. *Id.* at ¶ 23. Johnson could not recall if the catheter had been removed by this date or not. *Id.* at ¶ 21.

On June 25th, Johnson submitted a grievance stating he had been out of his pills for a few days and was in pain. *Defts' Ex.* J. He stated he needed "both of them." *Id.* In response, he was told that the only prescription given to him was Flomax. *Id.* While he concedes this was Newburn's written response to his grievance, Johnson asserts Newburn said he didn't need the pills anyway. *Id.* at ¶ 24.

On July 7th, Johnson submitted another grievance complaining that he was in pain and was out of his pills. *Resp.* at ¶ 26. In response, Newburn stated that Dr. Wright had prescribed Flomax. *Defts' Ex.* J.

Johnson maintains he did not receive all medication he was prescribed. *Resp.* at ¶ 28. He asserts the paperwork shows "what went on." *Id.* Review of the medication logs indicates the following: Johnson began receiving Cipro, prescribed for twice a day for ten days, on May 23rd, two days after it was prescribed. He received one dose on May 23rd, May 25th, May 29th, May 31st, June 2nd, and June 5th. He received two doses, as prescribed, on May 24th, May 26th, May 27th, May 28th, and June 1st. *Defts' Ex.* K. Johnson began receiving Tramadol, prescribed on an as needed basis, and Cipro, prescribed on a twice a day for ten days basis, on June 11th, one day after the medications were prescribed. He received no medication on June 21st. He received one dose of Tramadol on June 15th, and one does of Cipro on June 16th, June 17th, June 18th, June 20th, and June 22nd. He received two doses of both medications on June 11th, June 14th, and June 19th. He received two doses of Cipro on June 12th, June 13th, and June 15th. He received three doses of Tramadol on June 12th, June 17th, and June 18th. He received four doses of Tramadol on June 16th. Johnson began receiving Flomax on the day it was prescribed. He received one dose on June 20th, June 21st, June 23rd to June 25th, June 28th to July 1st, and July 3rd to July 8th. He received two doses of the medication on June 22nd, June 26th, June 27th, and July 2nd.

Johnson never personally spoke to, or communicated with, Sheriff Turner about his need for medical treatment. *Resp.* at ¶ 29. Johnson indicates he does not think Sheriff Turner knew what was going on. *Id.* However, Johnson states he "sent" for the Sheriff but "he never came." *Id.* He asserts Newburn was "running things" and "calling the shots." *Id.*

Johnson was asked whether he believed a custom, policy, or practice of Clark County resulted in his being denied adequate medical care. *Resp.* at ¶ 31. He indicated he did. *Id.* He stated they

failed to get him to the doctor on time and also put him in a cell with other inmates who threatened to remove the catheter themselves. *Id.*

**II. Applicable Standard**

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a . . . verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

**III. The Arguments of the Parties**

First, Defendants argue Johnson cannot establish the existence of a governmental policy, custom, or practice. They, therefore argue there are no grounds on which either Defendant can beheld liable in their official capacities. Second, Defendants argue Sheriff Turner is entitled to judgment as a matter of law because there is no evidence he was linked, directly or indirectly, to a constitutional

violation. Finally, Defendants maintain there is no evidence that they exhibited deliberate indifference to Johnson's serious medical needs. They maintain Johnson clearly was provided medical attention and received his prescribed medication.

Johnson maintains he informed Defendants about his kidney problems when he was booked in and also informed them he was on several medications. Further, he asserts Defendants assigned him to a cell that inhibited his ability to move around thus causing an exacerbation of the kidney condition. Once he was in need of emergency medical treatment, Johnson states Defendants delayed until the following day before taking him for treatment. Next, Johnson argues the Defendants failed to obtain his medications in a timely manner and failed to dispense the prescribed medication according to the doctor's instructions. Finally, Plaintiff contends his requests for medical supplies were ignored and/or not properly presented to medical personnel.

## IV. Discussion

"Where a prisoner needs medical treatment prison officials are under a constitutional duty to see that it is furnished." *Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989)(*citing Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). The Eighth Circuit analyzes both a pretrial detainee's and a convicted inmate's claim of inadequate medical care under the deliberate indifference standard. *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006). "Deliberate indifference to a prisoner's serious medical needs is cruel and unusual punishment in violation of the Eighth Amendment." *Gordon ex rel Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006)(*citing Estelle*, 429 U.S. at 106)).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v.*

*Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.1997)).

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Popoalii v. Correctional Medical Services*, 512 F.3d 488, 499 (8th Cir. 2008)(internal quotation marks and citations omitted).

In this case, Johnson relies on the following facts to support his claim that Defendants exhibited deliberate indifference: (1) Defendants were advised of his kidney problem and the fact that he was on various medications when he was booked in on May 8th; (2) he was placed in a small cell restricting his ability to move around to relieve his medical condition; (3) he requested emergency medical treatment, was in pain, and Defendants delayed a day in obtaining him treatment; (4) his prescriptions were not timely obtained or disbursed on the prescribed basis; and (5) his requests for medical supplies were ignored or not properly relayed to medical personnel.

Defendants have introduced no exhibits or affidavits setting forth the Clark County policy regarding medical care. Nothing has been submitted indicating what the booking officers do with medical information received from an individual being booked in. There is no indication in this case that Defendants sought further information regarding Johnson's "kidney condition" or his assertion that he was on various medications. Nothing has been provided indicating the Defendants' reason, if they had one, for delaying medical care from May 17th to May 18th. There is no evidence suggesting how requests for emergency medical treatment are handled. Nothing in the record contradicts Johnson's statement that he was in pain and was told his bladder could have "burst"

because of the delay. Nothing in the records contradicts the medication log showing that medication distribution was haphazard and not consistent with the doctor's orders.

While supervisors cannot be held liable on a theory of *respondeat superior*, they may be held liable if they knew the prisoner's "serious medical needs were not being adequately treated yet remain indifferent." *Langford v. Norris*, No. 09-1862, 2010 WL 2813551 (8th Cir. July 20, 2010)(*citing Crooks*, 872 F.2d at 804)). Clearly by no later than May 18th, Newburn had actual knowledge of Johnson's serious medical needs. Presumably, she had knowledge of his medical condition and medications from Johnson's booking information. As the CCDC apparently has no medical staff on duty, it is reasonable to assume that Newburn was either responsible for processing such information or responsible for training those who did so. Similarly, I believe there are issues of fact as to whether the County's policies, or lack thereof, caused, or contributed to, the alleged delays in the provision of medical care and prescription medications. County policy, in regard to the care and custody of detainees, is, of course, established by the Sheriff. Ark. Code Ann. § 12-41-502 (Supp. 2010)("The county sheriff of each county in this state shall have the custody, rule, and charge of the jail within his or her county and all prisoners committed in his or her county, and he or she may appoint a jailer for whose conduct he or she shall be responsible.").

In short, Defendants have clearly not established they are entitled to judgment as a matter of law. I therefore conclude there are genuine issues of fact that preclude summary judgment in their favor.

## V. Conclusion

I therefore recommend that the Motion for Summary Judgment (Doc. 17) be denied.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 2nd day of August 2010.

/s/ Barry A. Bryant
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE