IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

ROBERT EARL JOHNSON                                                            PLAINTIFF

v.                          Civil No. 6:08-cv-06063

DAVID TURNER, Sheriff,
Clark County, Arkansas; and
JACKIE NEWBURN, Jail
Administrator, Clark County
Detention Center                                                              DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Plaintiff, Robert Earl Johnson (hereinafter Johnson), filed this action pursuant to 42 U.S.C.

1983.  He proceeds *pro se* and *in forma pauperis*.  Pursuant to the provisions of 28 U.S.C. §

636(b)(1) and (3)(2011), the Honorable Robert T. Dawson, United States District Judge, referred this

case to the undersigned for the purpose of making a report and recommendation.

Johnson is currently incarcerated in the Arkansas Department of Correction (ADC).  He

contends his constitutional rights were violated while he was incarcerated at the Clark County

Detention Center (CCDC) from May 8, 2008, until July 9, 2008, when he was transferred to the

ADC.  Specifically, he maintains he was denied adequate medical care.

On February 22, 2011, an evidentiary hearing was held.  At the conclusion of the hearing,

the case was taken under advisement pending preparation of this report and recommendation.

**1.  Evidence Presented**

At the hearing, the testimony of the following witnesses was heard: (1) Robert Earl Johnson,

the Plaintiff; (2) Mark Easley; (3) Larry Wilson; (4) Roy Easley; (5) Ruel White, Jr; (6) Robert

-1-

Plyler; (7) Patrick Tinch; (8) Youlanda Molina McCloud; (9) Jail Administrator Ricky Allen Loy;

(10) Officer James R. Langley; (11) Former Sheriff David Turner, a named Defendant; (12) Former

Jail Administrator Jacqueline Newburn, a named Defendant; and (13) Officer Raymond Funderburk.

For purposes of discussion, the testimony of the witnesses will be summarized.

**Robert Earl Johnson**

Johnson testified that approximately three weeks prior to being booked into the CCDC he

had undergone surgery because of urination problems and was under the care of Dr. Wright.  During

the booking process, an "inmate booking screening questions" form was completed.  *See Plaintiff's*

*Exhibit* (hereinafter *Plff's Ex.*) 1.  Despite having told the booking officer about his kidney problem

and the fact that he was on a number of medications, Johnson noted that each question on the form

was answered "no" including the question about whether the prisoner was conscious.  *Id.*  Johnson

maintains that when he signed the questionnaire it contained "yes" answers.

Not long after he was booked in, Johnson testified he was placed on twenty-three hour a day

lock down.  According to Johnson, his limited ability to move caused his urinary tract to close.

Beginning on May 17th, Johnson testified he was in pain, his stomach was swollen up, he was having

difficulty breathing, and he unable to urinate.  Johnson asked to go to the emergency room.  By 9:30

or 10:00 p.m., Johnson testified that a number of inmates pounded on the door in an effort to get a

jailer's attention because of Johnson's medical condition.

Early in the afternoon on May 18th, Johnson was taken to the emergency room and a Foley

catheter inserted.  According to Johnson, he was told that he had "just made it."  If it had been any

longer before he received medical care, Johnson maintains he was told his bladder would have burst.

Johnson returned to the CCDC with the catheter in place.  After an unspecified period of time, he testified that the catheter drainage bag started to "stink" and despite multiple requests, Johnson maintained he was unable to get a new bag for the catheter.

On May 28th, Johnson was taken to the hospital to have the catheter removed.  Johnson testified he refused to allow it to be removed because he feared for his life.  Johnson maintains Newburn delayed his receipt of medical care, refused to provide him with new bags for the catheter, and failed to renew his prescription for Flomax in a timely manner.

Between May and June, Johnson testified he was taken to the emergency room or the doctor three or four times.  The second time Johnson was seen by Dr. Wright, Johnson indicates the doctor stated there was nothing more he could do for him.  Recently, Johnson testified that he had undergone surgery at the University of Arkansas Medical Sciences (UAMS) and now catheterized himself if he has difficulty with urination.

**Mark Easley**

Mark Easley testified that he was incarcerated in the CCDC at the same time as Johnson and in the same cell.  Easley testified Johnson asked for medical help and in an effort to obtain assistance for Johnson Easley beat on the door. Easley indicated it was the following day before a guard came to check on them.

**Larry Wilson**

Larry Wilson was also incarcerated at the CCDC at the time.  Wilson testified Johnson asked him for help in getting to the emergency room because of a kidney or bladder problem.  Wilson testified that Johnson repeatedly asked for medical treatment and was in pain.  In Wilson's opinion, Johnson was not receiving proper medical treatment.

Wilson beat on the door in an attempt to get a guard to assist.  While he did not recall an exact time, he believed it might have been after pill call, after 10:00 p.m., when he attempted to get some help for Johnson.  The following day, he believed between 9:00 and 10:00 a.m. a jailer came and checked on Johnson.

### Roy Easley

Roy Easley testified he was incarcerated in the CCDC and attempted to obtain assistance for Johnson by beating on the door.  Johnson did not receive medical treatment that day.  Instead, Easley testified it was a day or two later.

### Ruel White, Jr.

White testified he also attempted to obtain assistance for Johnson.  He believes it was about 10:30 p.m., when he attempted to get help for Johnson.

According to White, grievance forms were obtained from jailers.  The forms were turned in by sliding the form under the door to a guard.  The response time varied from the same day to several days.

White testified medical staff sometimes came to the cells.  Other times, inmates were called out one at a time in the morning.

### Robert Plyler

Plyler, was employed at the CCDC in May of 2008, he recalled Johnson being in the CCDC but could not recall anything specific about Johnson's situation.

According to Plyler, cell checks were done every thirty or forty minutes.  Medication was passed out at about the same time every day.  If there was only one guard available, the inmates were called out of their cells one at a time.  If there were two guards, medication was passed out at the

-4-

cell.

If an inmate wanted medical attention, he asked for a slip, filled it, and returned it to a guard. If the inmate said he needed emergency care, the dispatcher would be asked to get is touch with Newburn or the Sheriff.

**Patrick Tinch**

Tinch testified he recalled beating on the cell door in an effort to get medical assistance for Johnson. He testified no medical assistance was rendered until the following morning.

**Youlanda Molina McCloud**

McCloud testified she visited Johnson at the jail but could not recall the date. During the visit, Johnson told her about his medical condition and the efforts he made to seek help. McCloud did not speak to Sheriff Turner or Newburn.

**Ricky A. Loy**

Loy started working at the CCDC in April of 2008 and is currently the jail administrator. Loy recalls there was an inmate with a catheter in but does not recall any other details.

If an inmate has a medical issue, Loy testified the inmate would have to ask for a medical complaint form, fill it out, and give back to a guard to be left for Newburn. If an emergency situation was involved, Newburn was contacted and she decided whether the inmate needed to go to the hospital. According to Loy, arranging for transport to take an inmate to the hospital typically does not take more than five to twenty-five minutes. He testified it usually did not take as long as it did to transport Johnson.

Loy testified the guards tried to do cell checks every hour. There were times when the guard may have been kept away because he was booking someone in. If an inmate comes in with medical

issues, the screening questionnaire is normally given to the jail administrator.

Pill call was done four times a day; one after each meal and one before bedtime.  The medication is usually taken to the cells.  If the inmate is sleeping, an attempted is made to wake him up.

**James R. Langley**

Langley testified he had worked for the CCDC on and off for twenty years.  He was working there in May and June of 2008 and while he recognizes Johnson he cannot recall his incarceration.

When there is a medical emergency, a condition that appears critical or life threatening, the administrator or the Sheriff is contacted.  Cell checks are done but in the evening after lock-down jailers may not be able to do the checks if there is a disturbance in another cell block.

The last pill call is at 10:30 p.m.  A jailer goes to each cell, and the inmate signs for the medication.  If Johnson was on medication, Langley testified he gave it to him.  Johnson would have missed a dose if he was asleep, refused it, or something happened and he didn't get the mediation at that particular time.

**Former Sheriff David Turner**

Turner was Sheriff in May and June of 2008.  Turner testified that the medical care forms completed by inmates usually go to the jail administrator who takes care of it.  However, if surgery was needed, the form is forwarded to the Sheriff.  As Sheriff, Turner testified that he had authority over the budget for medical care.

At night, Turner testified they might have only one deputy covering the county.  It could take thirty to forty minutes before the deputy was able to return to the detention center to transport an inmate to the hospital.  If the situation was life threatening, an ambulance was called.

**Former Jail Administrator Jacqueline Newburn**

Newburn testified she worked at the CCDC from August of 2001 until January of 2009. Initially, she worked as a jailer and in May of 2008 became the jail administrator.

Newburn testified she recalled Johnson but did not recall him saying anything about medical problems. Once an inmate was processed in, if he had any medical problems, the jailer would notify Newburn.

An inmate with medical problems was required to fill out a written medical request. The request was then given to Newburn who would either talk to the Sheriff or call the doctor.

In response to Johnson's June 3rd request asking to be sent to the ADC because he did not want to become infected, Newburn indicates Dr. Wright's office had been contacted and stated there was no need for Johnson to be on antibiotics. *Defendants' Exhibit* 4 at pg. 1. When Johnson complained that he needed more drainage bags, Newburn called Dr. Gehiki's office and was told the bag was fine so long as it was not leaking and it could be changed monthly. *Id.* at pg. 2. Newburn testified they obtained some bags for Johnson's use but he refused to use them.

**Raymond Funderburk**

Funderburk works for the Clark County Sheriff's Department and was called in from the field on May 18th to transport Johnson to the hospital. Funderburk could not recall how long it took him to get back to the detention center.

At the hospital, Funderburk recalled the doctor advising Johnson that he had an obstruction or blockage. Funderburk testified that Johnson was in pain.

**2.  Discussion**

The Eighth Amendment imposes duties on detention center officials to ensure prisoners

receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The Due Process Clause of the Fourteenth Amendment imposes analogous duties on detention center personnel with respect to pretrial detainees. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). "This makes little difference as a practical matter, though: Pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment." *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007). *See also Hartsfield v. Colburn*, 491 F.3d 394, 396 (8th Cir. 2007)(deliberate indifference standard applies to pretrial detainees denial of medical care claim).

"An official who is deliberately indifferent to a prisoner's medical needs is subject to suit under § 1983." *McRaven v. Sanders*, 577 F.3d 974, 979 (8th Cir. 2009). The deliberate indifference standard "has both an objective and subjective component." *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009). The standard requires a Plaintiff to show: (1) the deprivation alleged is objectively serious; and (2) the official knew of and then disregarded an excessive risk to the plaintiff's health or safety. *Farmer*, 511 U.S. at 834.

In this case, Johnson maintains Defendants delayed his initial receipt of medical care, did not dispense his medication correctly, and denied his requests for new drainage bags. Deliberate indifference may be manifested by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). However, the "Constriction does not require jailers to handle every medical complaint as quickly as each inmate might wish." *Jenkins v. County of Hennepin, Minn.*, 557 F.3d 628, 633 (8th Cir. 2009). The objective seriousness of delay in treatment must be measured by reference to the effect of delay, which must be shown by verifying medical evidence. *Laughlin v.*

-8-

*Schriro*, 430 F.3d 927, 928 (8th Cir. 2005).

With respect to his initial receipt of medical care, while Johnson maintains he was told his bladder would have burst if treatment had been delayed any longer, the only evidence offered to support this contention is Johnson's own testimony.  The transport guard, Funderburk, did not recall any such statement being made by the doctor and nothing in the medical records support this.  The evidence establishes that Johnson had a medical condition, a urethral stricture, which caused him pain; however, there is no verifying medical evidence that establishes the detrimental effect of the delay.  Johnson's claim therefore fails.

Similarly, Johnson's claims regarding medication, new drainage bags, and his transfer to the Arkansas Department of Correction, also fail.  First, with regard to Sheriff Turner, there is no evidence suggesting he knew of Johnson's problems.  *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007)(to establish personal liability of a supervisory defendant, plaintiff must show personal involvement in, or direct responsibility for, deprivation of constitutional rights).  Second, Johnson offered no evidence showing adverse consequences from the method of medication distribution or the lack of a new drainage bag.  *Cf. Gillard v. Kuykendall*, 295 Fed. Appx. 102, 103 (8th Cir. 2008)(no evidence showing any adverse consequences from the delays in receipt of his medication).  Third, no evidence suggests the jail has any control over when an inmate is transferred to the ADC.

### 3.  Conclusion

For the reasons stated, I recommend that judgment be entered in favor of the Defendants and this case be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of the report and recommendation in**

which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this **19th day of May 2011.**

/s/ Barry A. Bryant
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE